# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 27 2017, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Irving Marshall Pinkus
Pinkus & Pinkus
Indianapolis, Indiana

Christopher Price
Certified Legal Intern
Pinkus & Pinkus
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Katherine A. Harmon
Jared S. Sunday
Mallor Grodner LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Lisa Haynes Whorley,

*Appellant-Petitioner,*

v.

John F. Whorley, Jr.,

*Appellee-Respondent.*

October 27, 2017

Court of Appeals Case No.
29A05-1611-DR-2637

Appeal from the Hamilton
Superior Court

The Honorable Daniel J. Pfleging,
Special Judge

Trial Court Cause No.
29D02-1406-DR-5652

**Robb, Judge.**

# Case Summary and Issues

[1] Lisa Haynes Whorley ("Mother") and John F. Whorley, Jr. ("Father") were married in 2003 and, after having two children together, separated in 2014. The trial court held a dissolution hearing over eight days in 2016 and issued Findings of Fact and Conclusions of Law on Final Dissolution on November 9, 2016. Mother appeals the trial court's dissolution decree, raising the following consolidated issues for our review:

> 1) Whether the trial court erred in awarding the parties joint legal custody of the children and naming Father the ultimate decision-maker;
>
> 2) Whether the trial court erred in determining the opportunity for additional parenting time need only be offered to Mother when Father *or* Father's housekeeper was unavailable to care for the children for a period that included an overnight;
>
> 3) Whether the trial court erred in its determination of Father's gross weekly income for child support purposes;
>
> 4) Whether the trial court properly valued certain items of marital property; and
>
> 5) Whether the trial court erred in unequally dividing the marital estate, awarding 57.5% to Father and 42.5% to Mother.

[2] With respect to issues concerning the parties' children, we conclude the trial court did not err in awarding joint legal custody of the children to the parties while designating Father as the ultimate decision-maker in the event of an

impasse or in determining the opportunity for additional parenting time need only be extended if a party needs child care overnight. The trial court did err, however, in determining the opportunity for additional parenting time need not be extended to Mother if Father's housekeeper is available to care for the children because she is not a "household family member." The trial court also erred in failing to account for Father's irregular income in the child support calculation.

[3] With respect to issues concerning the marital estate, we conclude the trial court did not err in valuing certain items of marital property. However, we conclude there is no rational basis set forth in the trial court's order supporting an unequal division of marital property because the trial court clearly erred in its findings regarding one of the relevant statutory factors and we are unable to infer from the trial court's findings that it considered two additional factors.

[4] We therefore affirm in part, reverse in part, and remand this case to the trial court.

# Facts and Procedural History

[5] Mother and Father met in Indianapolis in 1996 when they both worked for the same employer. In 1998, Father was offered a promotion that required he relocate to Las Vegas, Nevada. At Father's request, Mother left her employment and moved to Las Vegas to be with him. Mother made a down payment on a house the parties owned and lived in together for a couple of

years. The parties eventually sold that house; Mother moved into an apartment and Father bought a new house, although the two were engaged. Marisol Ortega began providing housekeeping services for Father at his home in 2002.

[6] The parties married in 2003. By this time, Father had approximately $6,000,000 in a Merrill Lynch account. The parties had their first child in 2004. Ortega then began providing nanny services for the Whorleys as well as housekeeping. Also in 2004, the parties purchased farmland in Murfreesboro, Tennessee, across the road from the farm where Father was born, for $1,000,000. Mother and Father moved back to Indiana in 2005; Ortega came with them to be a live-in housekeeper and nanny, a position she still retains in Father's household. The parties' second child was born in 2006. The children have attended a private school in Indianapolis since pre-school.

[7] Mother was a Certified Public Accountant and was employed until the parties' first child was born. When she left Indiana, she was making approximately $90,000 per year. She made $40,000 per year at her last job in Las Vegas. Once the parties' children were born, Mother was a stay-at-home parent for ten years until these dissolution proceedings began. She did not keep her CPA license current during this time. By the final hearing, Mother was working as a substitute at the children's school. Throughout the parties' relationship, Mother suffered from alcoholism. Father was unaware of her illness until October 2012, at which time Mother checked into an outpatient treatment program with Father's knowledge and support. Mother has been sober since October 2012

and has taken a professionally monitored home breathalyzer test twice a day since August 2013.

[8] After returning to Indiana, Father retired from the employment that had taken him to Las Vegas. He was involved with several different endeavors after his retirement in 2007. In 2008, the parties gave $400,000 to Oak Tree Associates, LLC, a real estate investment company in which Father's former boss, James Lintzenich, was the primary partner. The money was given pursuant to a Promissory Note between Oak Tree and the Whorleys with a promise of repayment with interest by August 15, 2012. Father testified that the money was not repaid by that date, nor has any money been received since. In fact, Oak Tree no longer exists as a corporate entity. In 2012, Father started Core Principle, a company "intended to impact college student performance through increasing class attendance using GPS fencing technology . . . ." Transcript, Volume V at 145. Father was the sole owner of the company. Mother initially assisted with accounting and payroll services and was the company's CFO for a time. In 2014, the parties invested $300,000 in Core Principle from a margin credit line against a joint account. Lintzenich loaned Core Principle $400,000 in late 2014/early 2015 pursuant to a convertible note. Mother insisted this money was actually repayment for the parties' earlier loan to Oak Tree but Father categorically denied that was the case. Father invested an additional $195,000 over the last half of 2015 out of his pre-dissolution disbursement from one of the parties' joint accounts. Father testified that because of the uncertainty surrounding the business as an asset subject to division in the

divorce, he was unable to secure additional outside investments and he closed the company in early 2016. In 2015, Father returned to employment with his original employer.

[9] The parties separated in 2014. A provisional agreement in 2015 provided the parties would share joint legal and physical custody of the children, with the parties splitting parenting time equally. The parties adopted the Indiana Parenting Time Guidelines and made provisions regarding opportunities for additional parenting time if a parent required child care for two or more hours. The trial court later amended this provision to require the opportunity for additional parenting time to be extended only if child care was needed for three or more hours "by any individual other than someone who is defined as a family or household member as defined in *Shelton v. Shelton*, 840 N.E.2d 835 (Ind. 2006)." Appellee's Appendix, Volume 2 at 50. Father interpreted this to mean if Ortega could be with the children, Mother need not be offered additional parenting time. Also, as part of the provisional agreement, each party received a pre-dissolution distribution of $1,000,000 from their joint Fidelity account.

[10] The trial court heard testimony and received 114 exhibits into evidence over eight days in February, July, and August of 2016. After the first four days of hearings in February, the trial court dissolved the marriage of the parties and bifurcated the remaining issues. On November 9, 2016, the trial court issued its Findings of Fact and Conclusions of Law on Final Dissolution addressing issues of custody, parenting time, and child support, as well as the value of

certain marital assets[1] and the division of the marital estate. Relevant to the issues presented on appeal, the trial court concluded:

> 10. Father, as the party seeking other than an equal distribution of the property, has the burden of presenting relevant evidence to rebut the presumption that an equal division of the marital property between the parties is just and reasonable and has done so pursuant to the findings of the Court.

> 11. The Court further finds that Father be awarded a larger percentage of the assets based upon the evidence in support of the contribution of Father to the acquisition of the property, regardless of whether the contribution was income producing, the extent to which the property was acquired by Father prior to the marriage or through inheritance or gift, and the dissipation of the marital estate due to Mother's alcohol treatment programs and over-employment of the children's nanny during the marriage, all in compliance with Ind. Code § 31-15-7-5.

> * * *

> 15. The best interests of the children are served by the parents' continual sharing of joint physical custody.

> 16. The best interest[s] of the minor children are served by the parents' sharing of joint legal custody, with Father having the ultimate decision making authority if a dispute arises. Both parties are ordered to not withhold agreement on legal decisions unreasonably.

---

[1] The parties stipulated to the value of several assets prior to trial.

17. The parents shall continue to share equal parenting time with the minor children with a week-on week[-]off schedule. Holidays and special days shall be pursuant to the Indiana Parenting Time Guidelines, with Father designated as the custodial parent.

18. Father should pay support to Mother in the amount of $622.12 per week through the Indiana Child Support Collection Unit, pursuant to Court's Exhibit B, the attached Child Support Obligation Worksheet [finding Father's weekly gross income to be $7,848.27].

Appealed Order at 23-24. Mother now appeals certain provisions of the trial court's order.

# Discussion and Decision

## I. Standard of Review

[11] The parties requested the trial court enter findings of fact and conclusions thereon pursuant to Trial Rule 52(A). We therefore apply the following two-tier standard of review: we first determine whether the evidence supports the findings of fact and then determine whether the findings of fact support the judgment. *Troyer v. Troyer*, 987 N.E.2d 1130, 1134 (Ind. Ct. App. 2013). We will set aside findings if they are clearly erroneous, which occurs only when the record contains no facts to support them either directly or by inference. *Campbell v. Campbell*, 993 N.E.2d 205, 209 (Ind. Ct. App. 2013), *trans. denied*. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* To determine whether the findings or judgment are clearly

erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences therefrom, and we do not reweigh the evidence or assess witness credibility. *Granzow v. Granzow*, 855 N.E.2d 680, 683 (Ind. Ct. App. 2006).

# II. Child Custody

[12]     The trial court made the following findings about custody of the parties' children:

> 20.  Both parties underwent psychological testing . . . . [The doctor] did not see anything in the psychological testing which would prevent either party from being able to appropriately parent the children.

> 21.  Certain actions by *both* parties have not been in the best interest of the minor children . . . .

> 22.  Mother struggled with alcoholism throughout the years until attending an outpatient program at Fairbanks in 2012.

> 23.  Mother has been sober since October 11, 2012 as confirmed by her twice daily testing using the SoberLink device.

> 24.  Father refuses to accept Mother's recovery.

> 25.  Father wishes to have the children evaluated to determine if Mother's drinking alcohol during pregnancy had a negative effect on the children's health or contributed towards their medical conditions. Mother is adamantly opposed to this occurring. The Court refuses to order such an evaluation.

26. The children have been counseling with Dr. Dalton for over two (2) years.

27. Dr. Dalton . . . testified that the children still need counseling. . . . The Doctor believed the parties were incapable of co-parenting at this time.

28. Father has requested the parties share physical custody of the children and that he receive sole legal custody. Mother has requested she be granted sole physical custody and that the parties share legal custody, with her being the ultimate decision maker.

29. The Court hereby finds that it is in the best interest of the minor children that the parents continue to share joint physical custody.

30. The Court hereby further finds that it is in the best interest of the minor children that the parents share joint legal custody, with Father having the ultimate decision making authority if a dispute arises. Both parties are ordered to not withhold agreement on legal decisions (regarding education, health care, and the religious upbringing of the children) unreasonably.

Appealed Order at 4-5.

[13] It is somewhat difficult to discern Mother's true argument regarding the trial court's custody decision. She argues the trial court erred in awarding joint legal custody without considering all the relevant factors, referencing disharmony and contentiousness between the parties that "all but guarantee[s] the inability of the parties to successfully co-parent." Brief of Appellant at 22. That argument would make it seem she does not believe the trial court should have

awarded joint legal custody. Yet, she requested joint legal custody before the trial court. She also argues the trial court erred in awarding Father "de facto sole legal custody" by making him the ultimate decision-making authority in case of a dispute, but that is essentially the result she sought in the trial court, albeit in her favor. *Id.* at 19. She requests a reversal of the trial court's order, but, because of her inconsistent positions, it is unclear what result she is ultimately advocating. Therefore, we will simply review the trial court's decision to grant joint legal custody to determine if it is supported by the law and the evidence.

[14] A trial court may award joint legal custody of a child if the court finds that such an award would be in the best interest of the child. Ind. Code § 31-17-2-13. The court is to consider as "a matter of primary, but not determinative, importance" that the parents have agreed to an award of joint custody. Ind. Code § 31-17-2-15. The court is also to consider:

> (1) the fitness and suitability of each of the persons awarded joint custody;
>
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:
    (A) live in close proximity to each other; and
    (B) plan to continue to do so; and

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

[15] *Id.* The trial court acknowledged this statutory authority regarding the award of joint custody in its order. *See* Appealed Order at 3-4, ¶ 18. Mother contends the trial court erred in awarding joint custody with Father as the final decision-making authority because it did not consider all the relevant factors. Specifically, Mother contends the trial court erred in "placing so heavy an emphasis on Mother's past illness . . . as a basis for depriving her of legal custody over her children" while not considering "Father's present day suitability and fitness as a parent." Br. of Appellant at 20-21.

[16] With respect to custody determinations, we presume the trial court reached the correct result and we review its decision for an abuse of discretion. *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995), *trans. denied*. Although the ability to cooperate is a prime consideration in an award of joint custody, the statute also states agreement to joint custody is of primary *but not determinative* importance. Therefore, an order of joint custody may be made even over the objections of one of the parents, although "a more careful scrutiny of evidence is necessary." *Walker v. Walker*, 539 N.E.2d 509, 513 (Ind. Ct. App. 1989). Here, although Mother objects *now*, she did not object to joint legal custody with ultimate decision-making authority in one parent in the trial

court; to the contrary, she *requested* that basic arrangement in the trial court, with herself as the ultimate decision-maker. In fact, it was Father who advocated for sole legal custody in the trial court. Nonetheless, after thoroughly reviewing the record, we do not believe the arrangement the trial court ordered is clearly erroneous.

[17]   We disagree with Mother that the trial court placed a heavy emphasis on her alcoholism. The trial court mentioned Mother's illness, acknowledged her four years of sobriety, admonished Father for his failure to do the same, and refused to indulge Father's request to subject the children to unwarranted medical testing. The trial court's findings in this respect actually acknowledge Mother's progress and current ability to appropriately and safely parent the children. We further disagree with Mother that the trial court did not appropriately consider *both* parties' fitness and suitability as parents. The trial court acknowledged both Mother's and Father's shortcomings in dealing with the children and also noted testimony from a doctor who had conducted psychological testing on the parties that he saw nothing to indicate either parent would be unable to appropriately parent the children. Mother's arguments about Father's "misconduct," *see, e.g.*, Br. of Appellant at 21, are essentially requests that we reweigh the evidence and find the balance in her favor. This we cannot do. *See Lindquist v. Lindquist*, 999 N.E.2d 907, 911 (Ind. Ct. App. 2013). Although the trial court did not make specific findings about the relationship between each parent and the children, the proximity within which the parties live, or the nature of the home environment each parent provides, it is clear from the

testimony that these factors are easily satisfied in favor of joint custody. The sticking point is the parties' willingness and ability to communicate and cooperate in parenting their children.

[18] Mother and Father provisionally agreed to joint legal and physical custody and that was the arrangement they operated under for over two years. Certainly there is ample evidence in the record that the parties had disagreements and arguments between themselves and that they were unnecessarily entrenched and petty about parenting time, trying to ensure that neither of them received even a minute more parenting time than the other and refusing to accommodate each other in changing schedules or facilitating activities on each other's time. The children's counselor did not recommend joint custody. This evidence does cast some doubt on the parties' ability to effectively make joint decisions regarding the children's day-to-day activities. And yet, there is no evidence that the parties have fundamental differences in their philosophies of child rearing and education, their religious beliefs, or their lifestyles. *See Walker*, 539 N.E.2d at 513 (holding evidence supported trial court's determination that joint custody was in child's best interest over mother's objection because there was no evidence that "child rearing [had become] a battleground"). To award full joint legal custody would be to impose an untenable situation on the parties and more importantly, on the children. But to award sole legal custody to one parent in this situation would be to reward one parent and punish the other when neither has demonstrated a greater inclination for cooperation and

compromise. As the *Walker* court noted with approval, a joint custody arrangement

> does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor. Moreover, the potential for cooperation should not be assessed in the "emotional heat" of the divorce.

> If the parents outside of the divorce setting, have each demonstrated that they are reasonable and are willing to give priority to the best interest of their child, then the judge need only determine if the parents can separate and put aside any conflicts between them to cooperate for the benefit of their child. The judge must look for the parents' ability to cooperate and if the potential exists, encourage its activation by instructing the parents on what is expected of them.

*Id.* at 512 (quoting *Beck v. Beck*, 432 A.2d 63, 71-72 (N.J. 1981)).

[19]    The trial court found a joint custody arrangement was in the children's best interest and encouraged Mother and Father to be reasonable in their joint decision-making efforts. As the trial court awarded joint physical custody with a true 50/50 split of parenting time—a finding Mother does not appeal—an award of joint legal custody makes a certain amount of logistical sense. But acknowledging the parties have at times acted less than admirably in dealing with each other with respect to the children, the trial court also included a failsafe so decisions do not get held up indefinitely. We cannot know whether

this arrangement will ultimately work, and we add our own admonition to the trial court's: it will only work if both parties try to make it work. The parties have been given a valuable chance to be equally involved in their children's lives and must *each* act reasonably in making decisions in the children's best interest. Father should not interpret his "ultimate decision-making authority" as a license to ignore Mother's input. Nonetheless, the trial court, which interacted with the parties firsthand over several months, believed joint legal custody was the best arrangement for this family. *See Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011) (because trial court judges have direct interactions with the parties over an extended period of time, they "are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children"). The evidence supports the trial court's decision that an award of a joint custody in the interest of promoting collaboration between Mother and Father is in the children's best interest. We find no abuse of discretion in the trial court's decision.

## III. Parenting Time

[20] The trial court made the following finding regarding the opportunity for additional parenting time:

> Going forward, the opportunity for additional parenting time shall only apply to times when either party requires care for the children [by] *other than a family or household member* for a period of time that includes an overnight. This modification will alleviate Mother's perceived need to investigate whether or not she is being offered the time she believes she is entitled to receive. Ms.

Ortega is deemed to be a household member for purposes of this IPTG provision. *See* Ind. Parenting Time G., Sec. I. (C)(3).

Appealed Order at 6, ¶ 36 (emphasis added). The relevant Parenting Time Guideline states:

> When it becomes necessary that a child be cared for by a person other than a parent or *a responsible household family member*, the parent needing child care shall first offer the other parent the opportunity for additional parenting time, if providing the child care by the other parent is practical considering the time available and the distance between residences.

Ind. Parenting Time Guideline I(C)(3) (emphasis added). The commentary to this guideline provides: "[t]he household family member is defined as an adult person residing in the household, *who is related to the child by blood, marriage or adoption*." (Emphasis added.) Providing opportunities for additional parenting time "promotes the concept that a child receives greater benefit from being with a parent rather than a child care provider who is not a household family member." *Id.* "It is presumed that this rule applies in all cases which the guidelines cover; however, the parties or a trial court may, within discretion, determine that a deviation is necessary or appropriate. Any such deviation must be accompanied by a written explanation." *Id.*

[21] Mother argues the trial court erred in two respects: one, in stating the opportunity for additional parenting time will only arise if a "family *or* household member" is unavailable to care for the children; and two, in modifying the length of time which invokes the opportunity.

[22] As to Mother's first contention, we agree the trial court erred in concluding Mother would not need to be offered the opportunity for additional parenting time if Ortega were available to care for the children. First, the trial court did not apply the plain language of the guideline. The guideline states the opportunity for additional parenting time arises when the child must be cared for by someone other than a parent *or a responsible household family member*. The trial court's finding states the opportunity for additional parenting time will only be offered to Mother when the children require care by someone other than a "family *or* household member." Appealed Order at 6, ¶ 36. The language used by the trial court does not appear in the guideline and clearly alters the guideline's intended meaning. Second, the trial court used that misquoted language to find that Ortega – Father's live-in, full-time housekeeper and nanny – is a "household member" and therefore a suitable caregiver for this purpose. The commentary to the guideline makes clear that the "responsible household family member" must both live in the household *and* be related to the children. By misquoting the guideline to create two separate categories of "family member" and "household member," and then using that misquoted language to declare Ortega to be a qualified person for this purpose, the trial court effectively denied Mother the opportunity to *ever* be offered additional parenting time. As this court has previously stated, "Relegating [the non-custodial parent's] interest in additional parenting time to third-in-line abrogates the goal of the Indiana Parenting Time Guidelines—promoting the best interests of the child through frequent, meaningful, and continuing contact between children and their parents." *Shelton v. Shelton*, 835 N.E.2d 513, 518

(Ind. Ct. App. 2005), *summarily aff'd by* 840 N.E.2d 835 (Ind. 2006). Ortega is *not* a "household family member" and therefore, when Father is not available to care for the children, regardless of whether Ortega is available, Mother should be offered the opportunity for additional parenting time with the children.

[23] Mother also argues the trial court deviated from the guidelines in modifying the length of time which would invoke the opportunity for additional parenting time without providing a written explanation for the deviation. In this case, the parties had initially agreed that two hours would be the threshold. While this case was pending, the trial court modified the threshold to three hours. In the final decree, the trial court changed the time period to overnights. The guidelines do not specify an amount of time that invokes section I(C)(3); on the contrary, the commentary to the guideline states "[t]he period of absence which triggers the exchange will vary depending upon the circumstances of the parties." Because there is no time limit in the rule, the trial court's decision is not a deviation from the rules and therefore does not require a written explanation. Moreover, the preamble to the Parenting Time Guidelines states that "[d]eviations from these Guidelines by either the parties or the court that result in parenting time *less than the minimum* time set forth below must be accompanied by a written explanation . . . ." Parenting Time G. Preamble (C)(3). Because the issue is Mother's opportunity to exercise *additional* parenting time, the trial court's decision does not result in her having less than the minimum time allowed by the Guidelines and does not necessarily require a written explanation. Nonetheless, the trial court did explain why it was

limiting the opportunity for additional parenting time to situations in which childcare was needed overnight. We cannot say the trial court abused its discretion in implementing an overnight threshold for the parties' exercise of additional parenting time.

## IV. Father's Weekly Gross Income

[24] Mother next contends the trial court erred in failing to include Father's 2016 and future bonuses in its calculation of Father's weekly gross income for child support purposes. The trial court found that Father earns approximately $450,000 per year, but because his effective tax rate is over the tax rate presumed by the Indiana Child Support Guidelines, the trial court reduced his weekly gross income from $8,635.85 to $7,848.27 for child support purposes. Although Father testified his base pay for 2016 was $450,000, he also acknowledged the possibility of bonuses and further acknowledged that in 2016, his total compensation package was in excess of $2,000,000, which included an additional $287,500 in cash bonuses and $1,320,000 in equity (stock) awards. *See* Petitioner's Exhibit 32. The trial court did not mention in its order nor did it factor into its child support calculation any irregular income.

[25] Father contends Mother has waived this issue by failing to submit a copy of her proposed child support worksheet to the trial court as required by the Child Support Guidelines and local rule. *See* Ind. Child Support Guideline 3(B);

Hamilton County Local Rule 402.10.[2]  In response, Mother has tendered to this court the proposed findings of fact she filed with the trial court which included a child support worksheet.[3]  Although this was filed at the conclusion of the hearing rather than at the start, the trial court stated that filing both attorney fee affidavits and child support worksheets at the conclusion of the hearing "might be easier."  Tr., Vol. V at 83-84.  We therefore decline to hold Mother has waived consideration of this issue, as she did in fact file a child support worksheet.

[26]  Mother's worksheet shows her proposed child support calculation was based on a weekly gross income figure for Father of $8,653.84.  Appellant's Appendix, Volume 2 at 30.[4]  This is basically the same figure the trial court used before applying a tax rate credit to arrive at Father's weekly gross income.[5]  However, Mother's proposed findings also include a paragraph that, had the trial court adopted it, would require Father to convey a lump sum of ten percent of his 2016 irregular income (which Mother calculated to be $160,755 for 2016) to

[2] The local rule requires a child support worksheet to be filed prior to any hearing or trial; the Child Support Guidelines require a worksheet to be completed and filed "when the court is asked to order support."

[3] Mother did not file an appendix at the time she filed her Appellant's Brief.  Based on Father's argument about this issue in his brief, she has requested leave to file a belated appendix which includes both parties' proposed findings of fact.  Although we can envision very few circumstances in which an appendix containing all relevant documents should not be filed with the original brief, we grant Mother's motion with an order issued contemporaneously with this opinion in order to fully adjudicate this issue.

[4] The trial court imputed income to Mother in the amount of $530 per week.  Mother's worksheet included this same amount of income and she does not challenge that amount on appeal.

[5] In fact, $450,000 translates to weekly gross income of $8,653.84 rather than $8,635.84.  It appears the trial court transposed two numbers in arriving at a figure of $8,635.84.  However, the difference in the child support amount with the correct number is negligible.

Mother and to do the same in all subsequent years. The evidence of Father's irregular income was minimal, at best. Yet, the trial court made *no* finding regarding Father's potentially substantial irregular income, not even to state why it was declining to include any bonus income. *See* Commentary to Guideline 3A(2)(b) ("When the court determines that it is not appropriate to include irregular income in the determination of the child support obligation, the court should express its reasons."). It is clear Father received in 2016 a cash "M[anagement] I[ncentive] P[lan] Award" of $287,500 for his work in 2015. Because Father returned to work for his company in 2015, it is not clear whether this bonus is representative of the bonus he might receive in years to come. Moreover, Father's "2016 Total Equity Award" of $1,320,000 in stock options does not have a fixed value until and unless those options are vested and Father chooses to sell them. Therefore, we cannot agree with Mother's argument on appeal that the trial court erred by failing to include any amount of the bonus income in Father's weekly gross income figure. *See* Commentary to Guideline 3A(2)(b) (noting it may not be equitable to include irregular income "by the process of determining the average of the irregular income by past history and including it in the obligor's gross income calculation").

[27]     Nonetheless, the Guidelines specify that courts should include bonus income in calculating child support. *Salser v. Salser*, 75 N.E.3d 553, 563 (Ind. Ct. App. 2017). They also note that irregular income is "very fact sensitive" and that judges should be "innovative in finding ways to include income that would have benefited the family had it remained intact . . . ." Commentary to

Guideline 3A(2)(b). One such equitable way to treat irregular income "may be to require the obligor to pay a fixed percentage of [irregular income] in child support on a periodic but predetermined basis . . . ." *Id.* That is the method Mother advocated. Although we disagree with Mother that the equity award should be included at the time it is granted—as noted above, it is not apparent from the record that the equity award is vested or that it has a present fixed value—the cash bonus would certainly have immediately benefited the family had it remained intact, and some part of that irregular income should be included in Father's child support obligation. Because the trial court failed to include any consideration of Father's irregular income in the child support calculation, we conclude the trial court clearly erred. On remand, we order the trial court to fashion a child support award that takes into consideration Father's irregular income and to set the amount and method of payment in accordance with the Guidelines.

## V. Valuation of Marital Assets

[28]  Mother contends the trial court erred in its valuation of certain marital assets. Specifically, Mother alleges: 1) the trial court erred in finding that James Lintzenich's payment of $400,000 in 2014-15 was not a repayment of money the parties loaned to him in 2008; 2) the trial court erred in finding that Father's company Core Principle had no value; and 3) the trial court erred in valuing the parties' real property in Tennessee at $1,500,000.

# A. Standard of Review

The trial court has broad discretion to value the marital assets and we review the trial court's valuation for an abuse of that discretion. *Pitcavage v. Pitcavage*, 11 N.E.3d 547, 563 (Ind. Ct. App. 2014). A trial court does not abuse its discretion if its decision is supported by sufficient evidence or reasonable inferences from the evidence. *Trabucco v. Trabucco*, 944 N.E.2d 544, 558 (Ind. Ct. App. 2011), *trans. denied*. If the trial court's valuation is within the scope of the evidence, the result is not an abuse of discretion. *Webb v. Schleutker*, 891 N.E.2d 1144, 1151 (Ind. Ct. App. 2008).

# B. Lintzenich Loan and Value of Core Principle

Because these two issues are entwined, we address them together. With respect to the transactions between the Whorleys and Lintzenich and the value of Core Principle, the trial court found:

> 89. During the time frame following the date of the Petition for Divorce until the Parties physically separated, the Parties lived off the joint Fidelity account . . . by paying for the marital expenses directly from it.
>
> 90. The Parties each received a pre-distribution of $1,000,000 from the Fidelity account . . ., pursuant to the Provisional Agreement approved by the Court on February 5, 2015.
>
> * * *
>
> 94. The [Fidelity] account had an associated line of credit which was approved of jointly by the parties.

\* \* \*

96.  Although Mother has requested the court consider reducing the line of credit by the $300,000 which was used to help fund Core Principle, the court declines to do so.  The parties jointly agreed to the line of credit and the payment in question was made prior to the date of filing.

\* \* \*

98.  Father had started a business, Core Principle, prior to the date of filing.  Core Principle created software to help track the attendance of college students.

99.  At the time the dissolution proceeding was filed, Father was employed by Core Principle.  He maintained that employment until he left in June 2015 to take the job with [his original employer].

100.  After the dissolution proceeding was filed, Father attempted to get Mother to agree to the sale of the business or to take steps to obtain additional investments in the business.  Mother refused to consent to either occurring.

101.  Father was forced to take a loan from James C. Lintzenich to attempt to keep Core Principle viable.

102.  Core Principle relinquished its office space in December 2015 and is no longer in operation.

103.  Core Principle is indebted in the amount of $400,000 to James C. Lintzenich . . . .  Father shall be solely responsible for the repayment of this debt.  Father shall receive Core Principle

and shall have the ability to dispose of the assets of the same as he sees fit.

* * *

118.  The parties had made an investment of $400,000 into Oak Tree Consulting in August 2008.

119.  The investment was due to be repaid by August 15, 2012 . . . . However, as of the date of the final hearing, no repayment had occurred.

120.  Father anticipates that some repayment may occur in the future but is unsure as to the amount or date of repayment.

121.  The parties shall equally divide any repayment that occurs from the Oak Tree Consulting investment.

Appealed Order at 14-18.  The trial court ultimately valued Core Principle at negative $400,000.  *Id.* at 19.

[31]  Essentially, Mother contends the trial court erred in not including an additional $895,000 in the marital pot representing the cash injected into Core Principle in its waning months.  In May 2014, $300,000 from the parties' margin credit line on their Fidelity account was transferred to Core Principle.  Mother said she was unaware a draw had been made on the credit line for that purpose until several weeks later.  However, she also testified that she and Father had discussed that very thing and both signed the paperwork that opened up the capacity to make such a draw.  She argues that although she was aware of and

agreed to opening the credit line, she did not know Father was *actually* going to withdraw money. The trial court clearly did not give credit to Mother's testimony on this matter. Father testified an additional $195,000 came from his portion of the pre-distribution from the Fidelity account, and therefore, his monetary contributions to Core Principle had no effect on the marital estate. To the extent Mother argues he should not have made those investments, there is no harm to her. That leaves the $400,000 from Lintzenich.

[32] At first glance, that the parties loaned a company in which Lintzenich was the primary partner $400,000 in 2008 and then Lintzenich loaned $400,000 to Core Principle in 2014-15 does not seem like a coincidence. And perhaps it is not. Mother's "take" on that transaction was "that it's at least a subtle or an indirect payback of the [original] loan." Tr., Vol. III at 12. She testified that "months before [Lintzenich's] payments came in, . . . [Father] talked to me a couple times about how [Lintzenich] was thinking about investment . . . [but] I think the simplest way to look at it for me is that it really was – even if he was directed to make payments or it was involved in another agreement, that it really was to pay back the $400,000." *Id.* at 13. However, there is evidence in the record to support the trial court's findings to the contrary. Father denied that Lintzenich's loan to Core Principle was a repayment of the earlier loan, testifying that "it is my statement that it has never been in any way connected to any other investment or loan." Tr., Vol. V at 159. A 2008 promissory note between the Whorleys and Lintzenich's company, Oak Tree, showing Oak Tree is obligated to repay the loan from the Whorleys with interest was introduced

into evidence, as was a 2014 convertible note between Lintzenich and Core Principle showing Core Principle is obligated to repay Lintzenich in either cash or shares. The documentary evidence supports the trial court's findings that these were two separate and unrelated transactions.

[33]   Mother testified she believed Core Principle was worth $370,000 on the date the dissolution was filed. Father testified he did not believe Core Principle had any value at the time of the final hearing. During an earlier hearing, Father testified extensively about Core Principle, noting the original plan was to bring in three million dollars during the first two years, but "due to the uncertainty of the outcome of this [dissolution] process," Core Principle was unable to bring in any money after the dissolution proceedings began besides Father's additional contributions and the Lintzenich note. Tr., Vol. II at 17. Even after the infusion of cash, by October of 2015, only approximately $25,000 remained in Core Principle's bank account. For the fall semester of 2015, Core Principle was providing its service as a free pilot project to seventeen universities. Father testified the lack of capital had caused the company to go from five employees to three and to move out of its rented office space, but he was trying to keep the company afloat long enough to live up to those contracts. At the final hearing, Father testified he had closed the company earlier in 2016. The trial court's decision that Core Principle did not have any positive value is within the scope of the evidence – the trial court can value an asset as of any time between the date of filing and the date of the final hearing. *Pitcavage*, 11 N.E.3d at 563.

Even accepting Mother's valuation at the outset of the divorce proceedings, the company incurred debt in excess of that value in trying to remain viable.

[34] The trial court ordered that if Oak Tree ever repaid the 2008 loan, the repayment was to be split between the parties. The trial court further ordered Father to be solely responsible for repaying the loan from Lintzenich. In the final analysis, the documentary evidence and testimony support the trial court's findings regarding these items.

## C. Tennessee Property

[35] With respect to the property the parties owned in Tennessee, the trial court found:

> 85. Father's expert . . . testified that he believed the value of the Tennessee real estate to be $1,035,170 . . . .
>
> 86. Mother's expert . . . testified that he believed the value of the Tennessee real estate to be $2,040,000 . . . .
>
> 87. The property was purchased by the Whorleys in 2004 for $1,000,000.
>
> 88. The Court finds that the value of the Tennessee real estate is $1,500,000 and shall be awarded to Father.

Appealed Order at 14.

[36] Mother contends the trial court's valuation is not supported by the evidence because no expert testified to that value. Yet, the trial court's valuation—an

average of the parties' two appraisals—falls squarely within the scope of the evidence. *See Webb*, 891 N.E.2d at 1151 (holding trial court's determination that value of farm equipment was an average between the two values offered by the parties was within the scope of the evidence and not an abuse of discretion); *Cleary v. Cleary*, 582 N.E.2d 851, 852-53 (Ind. Ct. App. 1991) (holding the trial court's method of averaging two values offered into evidence to determine the value of an asset is not against the logic and effect of the facts before the court). The trial court did not abuse its discretion in valuing the Tennessee property.

# VI. Distribution of Marital Estate

[37] Finally, Mother contends the trial court erred in making an unequal distribution of the marital estate because the trial court failed to consider each statutory factor in dividing the marital estate and improperly weighed the factors it did consider.

[38] The division of marital assets lies in the trial court's discretion and we will reverse only for an abuse of that discretion. *Fischer v. Fischer*, 68 N.E.3d 603, 608 (Ind. Ct. App. 2017), *trans. denied*. Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for the trial court's. *Hendricks v. Hendricks*, 784 N.E.2d 1024, 1027 (Ind. Ct. App. 2003). Indiana Code section 31-15-7-4(b) requires the trial court to divide the marital property in a just and reasonable manner. Section 31-15-7-5 states the court "shall presume that an equal division of the marital property between the parties is just and reasonable." This presumption can be rebutted

by a party who presents evidence of the following factors showing that an equal division would not be just and reasonable:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

> (2) The extent to which the property was acquired by each
>> spouse:

>>> (A) before the marriage; or
>>> (B) through inheritance or gift.

> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective . . . .

> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

> (5) The earnings or earning ability of the parties as related to:

>>> (A) a final division of property; and
>>> (B) a final determination of the property rights of the parties.

Ind. Code § 31-15-7-5. In dividing the marital property, the trial court must consider all the statutory factors, but is not required to explicitly address each one in its order. *Del Priore v. Del Priore*, 65 N.E.3d 1065, 1078 (Ind. Ct. App. 2016), *trans. denied*. We presume the trial court considered all the factors, and the trial court need only state its reasons for deviating from an equal division. *Shumaker v. Shumaker*, 559 N.E.2d 315, 318 (Ind. Ct. App. 1990). Nonetheless,

because the trial court may not rely on just one of the factors to support an unequal division of property, *Helm v. Helm*, 873 N.E.2d 83, 90 (Ind. Ct. App. 2007), we must be able to infer from the trial court's findings that it did indeed consider all the factors in conjunction with each other, *Montgomery v. Faust*, 910 N.E.2d 234, 239 (Ind. Ct. App. 2009). As long as we are able to say the trial court considered all the evidence bearing on the statutory factors, there is no requirement that the trial court find a certain number of the factors weigh in favor of an unequal division to support such a result.

[39] The trial court made the following findings regarding distribution of the marital estate:

> 69. The extent to which each spouse has contributed to the acquisition of the property, regardless of whether the contribution was income producing, favors a balancing of the factors in favor of Father.
>
> 70. Prior to the Parties' marriage, Father's net worth was approximately $5,797,489 . . . . Mother did not provide documentation of any assets that she brought into her marriage.
>
> 71. During the marriage, Father managed the Parties' investments and increased the value of the marital estate during that time.
>
> * * *
>
> 75. Throughout the marriage and during the pendency of the divorce, Father's continued employment and business endeavors helped sustain the marital estate.

76. The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift favors a balancing of the factors in favor of Father.

77. The conduct of the Parties during the marriage as related to the disposition or dissipation of their property favors a balancing of the factors in favor of Father.

78. Although Mother was a stay-at-home mother throughout the Parties' marriage, the Parties employed a nanny, Marisol Ortega, for sometimes over 80 hours per week from 2005 through 2013, to assist Mother in parenting the minor children . . . . [T]he parties paid Marisol Ortega a total of $576,636.64 from 2005 to 2013.

79. The Parties also employed a night nanny after both children were born and an additional part-time nanny . . . for which there were expenses incurred.

80. The Parties paid approximately $8,750 for Mother's Treatment Program and Breathalyzer monitoring through Sober Link . . . .

81. The Parties further paid for numerous counselors and treatment at Fairbanks treatment center in an attempt to address Mother's alcoholism. The costs for the same were substantial.

82. Father has the burden of presenting relevant evidence to rebut the presumption that an equal division of the marital property between the Parties is just and reasonable.

83. Father has rebutted the presumption in favor of an equal division of the marital estate by virtue of the evidence in support of the contribution of each spouse to the acquisition of the

property, regardless of whether the contribution was income producing, the extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift, and the distribution and dissipation of the marital estate during the marriage.

* * *

126. Father is entitled to 57.5% of the remainder of the marital estate as an unequal, yet equitable distribution of the marital estate.

Appealed Order at 12-13, 18. Mother contends the trial court abused its discretion in dividing the marital property unequally because it did not clearly consider the parties' relative earning capacity and economic circumstances, did not consider her contributions to the parties' marital estate, and erroneously considered the money paid to family help and to Mother's recovery as dissipation of assets. We agree with Mother on this point.

## A. Contributions to Acquisition of Property

[40] The trial court made explicit findings as to this factor and found it weighed in Father's favor. *See* Appealed Order ¶¶ 69-75. The trial court focused on Father's substantial assets at the time of the marriage and his employment and management of the parties' assets during the marriage. The trial court noted Mother did not provide any evidence of the assets she owned at the time of the marriage. However, the trial court did not mention evidence that Mother provided the down payment for the house the parties purchased in Las Vegas, a house they later sold and presumably used the proceeds from to buy a new

house in which the parties eventually settled together and welcomed their first child. *See Chestnut v. Chestnut*, 499 N.E.2d 783, 786 (Ind. Ct. App. 1986) (holding trial court properly considered wife's contributions during the parties' cohabitation before marriage). There was evidence Mother left a higher-paying job in Indiana to join Father in Las Vegas at his request but continued to work until the parties' first child was born. Moreover, despite the fact the parties hired help for their home and children, there is no evidence Mother abdicated housekeeping and childrearing responsibilities for the ten years she was a stay-at-home parent. Further, Mother's presence in the home allowed Father the time and support necessary for him to pursue his business and entrepreneurial goals. We live in an age that honors the marital partnership by valuing the contributions of spouses who do not work outside of the parties' home as we do the monetary contributions of wage earners. Both parties made substantial contributions to the acquisition of property. Nonetheless, considering our standard of review and Father's monetary contributions to the parties' marital estate throughout the marriage, we cannot say the trial court's finding that this factor weighs in favor of an unequal division is clearly erroneous.

## B. How and When Property Was Acquired

[41] The trial court also made a general finding about this factor and found it weighed in Father's favor, though there were no other specific findings supporting this conclusion. *See* Appealed Order at ¶ 76. There is little evidence of how Father amassed nearly six million dollars before the parties' marriage, but there was evidence that Mother made the down payment on their first Las

Vegas house because Father did not "have those resources. He still had some . . . I believe a good amount of debt . . . ." Tr., Vol. II at 130. It would appear then that Father amassed the bulk of that money during the parties' cohabitation. *See* Tr., Vol. V at 126 (Father testifying that his employer made him a financial incentive offer if he stayed for four years and he earned "the first lump sum of money" from that in 2000 or 2001). There is no evidence of inheritance or gift, and Father concedes in his brief that this factor "is at most neutral." Appellee's Brief at 38.

## C. Present Economic Circumstances

[42] The trial court made no findings with respect to the economic circumstances of the parties at the time the disposition was to become effective. The evidence shows Father makes a guaranteed salary of nearly half a million dollars with the potential for earning several times that salary through bonuses and stock options each year. He lives in the marital home which is mortgage-free and collects rent from a garage apartment tenant. The amount in his retirement account is nearly three times the amount in Mother's. Mother, who was a CPA when the parties met, has been out of the workforce for at least ten years. Even if she were to desire to return to work as a CPA, she would have to renew her license and it would take time to return to the workforce in this capacity. She currently works as substitute teacher at the children's school, earning $13.71 an hour, although it is unclear how many hours a week she works. For purposes of child support, the trial court found Mother to be voluntarily underemployed, and Mother does not dispute the income the trial court imputed to her. But

even at that imputed salary, $530 per week, Mother would earn less than $30,000 per year. And Mother was required to buy a house when she moved out of the marital home. The parties' incomes and resources are disparate, yet each will have the children in his or her care an equal amount of time. Mother is at a distinct disadvantage when it comes to her economic circumstances at the time of the dissolution.

## D. Conduct of the Parties with Respect to Property

[43] The trial court made several findings about this factor and again, found it weighed in favor of Father. *See* Appealed Order at ¶¶ 77-81. The trial court focused on the money the parties spent on household help and Mother's alcoholism-related treatment and essentially determined those expenditures constituted dissipation of marital assets by Mother.

[44] "Waste and misuse are the hallmarks of dissipation. . . . It generally involves the use or diminution of the marital estate for a purpose unrelated to the marriage . . . ." *In re Marriage of Coyle*, 671 N.E.2d 938, 943 (Ind. Ct. App. 1996). Factors to be considered in determining whether dissipation has occurred include whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage, the timing of the transaction, whether the expenditure was excessive or de minimus, and whether there was intent to hid, deplete, or divert the marital asset. *Goodman v. Goodman*, 754 N.E.2d 595, 598 (Ind. Ct. App. 2001).

[45]  As for the parties' household help, the trial court found the parties had spent nearly $600,000 over eight years paying Ortega "to assist Mother in parenting the minor children." Appealed Order at 12. The trial court apparently found this to be an unnecessary and excessive expense. First, the tenor of the trial court's finding—that it was Mother's responsibility alone to parent the children and that she was unable to do so—strikes us as inappropriate. It is the responsibility of *both* parents to parent their children. In this regard, we note that now that the parties have divorced, Mother cares for the children when they are with her on her own and Father continues to employ Ortega and enjoy the benefits of her assistance. Second, *both* parties acquiesced in and were able to afford employing household help, and the expenditure was clearly made for the benefit of the marriage. *See, e.g.,* Tr., Vol. V at 205 (Father testifying, "[I]t was clear to me from the start that we would do better as a couple and . . . as a family if we had a lot of childcare support."). There is no evidence supporting the notion that the parties' mutually agreed employment of full-time household help was a waste or misuse of the marital assets.

[46]  As for the money spent on Mother's rehabilitation and treatment, again, there is no evidence supporting the trial court's finding that those funds were misused or wasted for a purpose unrelated to the marriage. If Mother had, for instance, diabetes, no one would say the money spent on treating that disease had been wasted. There is no reason to do so with respect to the disease of alcoholism, either. When Father found out about Mother's alcoholism, he encouraged her to get treatment for her own health, the safety and security of their children,

and the health of their marriage. Father also encouraged Mother to enter the Soberlink program even though Candace Backer, who oversees the program, did not necessarily think the program would be beneficial to Mother because she had already been sober for nearly a year. Backer testified the program is intended for people who have difficulty maintaining their recovery and need a higher level of accountability and she felt Mother was already past that stage of recovery. Nonetheless, Backer agreed to accept Mother into the program at the parties' request. That Mother continued to use the Soberlink breathalyzer device twice a day and incur those monitoring expenses is apparently due to Father's insecurity about a possible relapse despite 1,067 consecutive tests over two and one-half years that showed no presence of alcohol.

[47] In short, although the evidence supports the factual findings of the trial court about how much was spent and on what, all of these expenses were incurred openly with the mutual agreement and knowledge of both parties and for purposes related to the marriage. The trial court's findings do not support the trial court's conclusions that Mother dissipated marital assets or that this factor weighs in favor of an unequal distribution.

## E. Earning Ability

[48] Although the trial court did make findings regarding the parties' current income in the context of their child support obligations, it made no findings with respect to the parties' relative earning abilities in considering the appropriate division of the marital estate. There is nothing in the evidence to suggest Father will not or could not continue to make a substantial salary in his chosen field,

supplemented by his other business interests. Mother, on the other hand, will likely have to undergo some additional education whether she intends to obtain employment as a CPA or enter some other field. It is unlikely she will be able to match her previous high salary for a considerable time, if ever. The earnings and future earning ability of Father at the time of the dissolution are vastly superior to Mother's.

## F. Summary

We recognize that we will reverse a property division only if there is no rational basis for the award. *Helm*, 873 N.E.2d at 89. Here, there is nothing in the trial court's order to suggest the trial court considered the parties' present economic circumstances or earning ability—factors which clearly weigh in Mother's favor—and it unfairly penalized Mother in considering the conduct of the parties with respect to their property during the marriage. In addition, it does not appear there was substantial property acquired by either party before their relationship began. Based on the record before us, we conclude there is no rational basis supporting the trial court's determination that Father rebutted the presumption that an equal division of the marital property is just and reasonable. We therefore remand for the trial court to effectuate an equal distribution of the property.

## Conclusion

The trial court did not clearly err in awarding the parties' joint legal custody of their children with Father as the ultimate decision-making authority, nor did

the trial court err in ordering the opportunity for additional parenting time need only be offered if a parent needed child care for a period including an overnight. Those orders of the trial court are affirmed. However, the trial court did err in interpreting Indiana Parenting Time Guideline I(C)(3). Although Ortega is a "household member," she is not a "household family member" and therefore her availability does not affect the opportunity for additional parenting time. This order of the trial court is reversed. The trial court also erred in failing to include any of Father's irregular income in the child support calculation. The child support order is remanded for further consideration consistent with our decision herein.

[51] Further, the trial court did not err in valuing the loan to be repaid by Lintzenich, Father's company Core Principle, or the parties' Tennessee property. The trial court's valuation orders are affirmed. But the trial court's conclusion that Father has rebutted the presumption of an equal division of the marital property is clearly erroneous, as it rests on improper considerations and was made without taking into account all of the relevant factors. The trial court's property division is therefore reversed.

[52] We remand this case for the trial court to amend its order with respect to parenting time and child support consistent with this opinion and to further amend its order to effect an equal division of the marital property.

[53] Affirmed in part, reversed in part, and remanded.

Vaidik, C.J., and Bailey, J., concur.